UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Frank A. Baker,

　　　　　　　　　　　Plaintiff,

vs.

Brian Ficcadenti, Brett Palkowitsch, Brian
Norwicki, Anthony T. Spencer and Joseph
M. Dick, acting in their individual capacities
as St. Paul police officers, Mark Ficcadenti,
acting in his individual and official capacity
as a supervisory St. Paul police officer, Mike
Ernster, acting in his individual and official
capacity as a supervisory St. Paul police
officer, John Does 1-2, acting in their
individual and official capacities as supervisory
St. Paul police officers, Thomas E. Smith,
acting in his individual and official capacity
as the Chief of Police, and the City of St. Paul,

　　　　　　　　　　　Defendants.

Case No. _____

**COMPLAINT**

**JURY TRIAL DEMANDED
UNDER FRCP 38(b)**

---

For his Complaint, Plaintiff Frank A. Baker ("Baker"), hereby states and alleges as
follows:

　　　　1.　　　This is an action for money damages for injuries sustained by Baker as a result
of the use of excessive force, unreasonable search and seizure, false arrest, failure to
intervene and other violations of his constitutional rights by Defendants Brian Ficcadenti,
Brett Palkowitsch, Brian Norwicki, Anthony T. Spencer and Joseph M. Dick.  The conduct
of these Defendants violated Baker's well-settled federal civil rights, all while acting under
color of state law.

2.     Plaintiff asserts claims against Defendants Mark Ficcadenti, John Does 1-2 and Thomas E. Smith with regard to their roles as trainers, supervisors and the Chief of Police of the St. Paul Police Department, respectively.

3.     Plaintiff also asserts claims against the City of St. Paul (sometimes referred to herein as the "City") under *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978) and *Canton v. Harris*, 489 U.S. 378 (1989).

4.     Baker was, at all times material herein, a citizen of the United States and a resident of the State of Minnesota.

5.     Upon information and belief, Defendant Brian Ficcadenti ("B. Ficcadenti") was, at all times material herein, a duly appointed and acting officer of the St. Paul Police Department.  He is sued in his individual capacity.

6.     Upon information and belief, Defendant Brett Palkowitsch ("Palkowitsch") was, at all times material herein, a duly appointed and acting officer of the St. Paul Police Department.  He is sued in his individual capacity.

7.     Upon information and belief, Defendant Brian Norwicki ("Norwicki") was, at all times material herein, a duly appointed and acting officer of the St. Paul Police Department.  He is sued in his individual capacity.

8.     Upon information and belief, Defendant Anthony T. Spencer ("Spencer") was, at all times material herein, a duly appointed and acting officer of the St. Paul Police Department.  He is sued in his individual capacity.

9.      Upon information and belief, Defendant Joseph M. Dick ("Dick") was, at all times material herein, a duly appointed and acting officer of the St. Paul Police Department. He is sued in his individual capacity.

10.     Upon information and belief, Defendant Mark Ficcadenti ("M. Ficcadenti") was, at all times material herein, a duly appointed and acting supervisory officer of the St. Paul Police Department.  At times material herein, he was the head trainer for the St. Paul Police Departments' K-9 unit and is sued in his individual and official capacities.

11.     Upon information and belief, Defendant Mike Ernster ("Ernster") was, at all times material herein, a duly appointed and acting supervisory officer of and public spokesperson for the St. Paul Police Department.  He is sued in his individual and official capacity.  Ernster was a K-9 officer from 2000 to 2013 according to the department website.

12.     Upon information and belief, John Does 1-2 were, at all times material herein, duly appointed and acting supervisory officers of the St. Paul Police Department.  They are sued in their individual and official capacities.

13.     Upon information and belief, Thomas E. Smith was, at times material herein, the Chief of Police of the St. Paul Police Department.  He is sued in his individual and official capacity.

14.     Defendant City of St. Paul is a municipality duly incorporated under the laws of the State of Minnesota.

15.     Baker brings this action pursuant to 42 U.S.C. §§ 1983, 1988 and 1981, the Fourth Amendment to the United States Constitution and 28 U.S.C. §§ 1331 and 1343(a)(3).

3

The aforementioned statutory and constitutional provisions confer original jurisdiction of this Court over this matter.

### Factual Summary

16.  On Friday, June 24, 2016 at around 10:00 p.m., Baker returned home from work, parked his 2004 Jeep Liberty in the parking lot near his apartment located at 1871 7th Street East, St. Paul, Minnesota, and sat in his vehicle talking on his cellphone.

17.  The temperature and dew point in St. Paul on that date and at that time were 75 degrees Fahrenheit and 64.9 degrees Fahrenheit respectively.

18.  Baker was a 52 year old, African-American male.

19.  Baker had done nothing wrong or remotely criminal on June 24, 2016.

20.  Baker's hair was in dreadlocks and he was wearing a white tee shirt and other items of clothing.

21.  According to the St. Paul Police Department ("SPPD") CN Detail Report for this incident, St. Paul officers received an anonymous call regarding a "group of people with bats, golf clubs, and at least one with a gun" "outside" of 1891 7th Street East "in front of" the building.

22.  The anonymous caller noted that there was a black male with dreadlocks last seen wearing a white tee shirt who "had [a] gun in hand." There was no mention of any car by the caller. There was no mention of a "fight" by the caller disseminated by dispatch.

23.  It is clearly established law that "[a]n anonymous tip that a person is carrying a gun is not, without more, sufficient to justify a police officer's stop and frisk of that person." *Florida v. J.L.*, 529 U.S. 266, 266 (2000). Such an anonymous tip lacks "sufficient incidia of

reliability to provide reasonable suspicion" to make a Terry stop. *Id.* at 270 (quoting *Alabama v. White*, 496 U.S. 2412, 327 (1990).

24.     Here, upon this information alone, which included only a location and vague description of an individual, officers did not have reasonable suspicion to stop or frisk the subject who was reportedly in possession of a gun *or* anyone in the general area matching the generic description absent more articulable facts.

25.     Numerous St. Paul officers responded to 1891 7th Street East to respond to the anonymous call.

26.     None of the officers were ever able to identify any of the purported individuals supposedly in front of 1891 7th Street East with the supposed potpourri of weapons.

27.     Baker's apartment building where he was parked was three buildings away from the apartment mentioned by the anonymous caller.  The 1891 7th Street East building is located on the corner of Hazel Street North and 7th Street East, while Baker's building is further west and closer to the middle of that block.

28.     There are multiple apartment buildings adjacent to each other on the north side of 7th Street East.

29.     Baker was not associated with the anonymous call in any way.

30.     Defendant B. Ficcadenti found Baker, who he claims matched the generic description of the anonymously reported individual with a gun, and made an unconstitutional stop.

31.     In his report, Defendant B. Ficcadenti says there was a "large group fighting" in the area with weapons.  This was never transmitted to him by dispatch and was added by him to make the call seem more dangerous.

32.     Claiming Baker matched the generic description provided by the anonymous caller, Defendant B. Ficcadenti stopped and parked his St. Paul police squad car to the right of where Baker sat in his vehicle, exited his squad and also removed his K-9 partner, Falco.

33.     Upon information and belief, Falco was a two-year-old Belgian Malinois, who had been working as a K-9 with the SPPD since May of 2015.

34.     Upon information and belief, Defendant M. Ficcadenti remained the head K-9 trainer as of Falco's start date with the SPPD.

35.     Defendant B. Ficcadenti and Falco are pictured below.



6

36.     Baker's proximity to the location described in the anonymous call was innocuous – it would not have been unusual to find a black male with dreadlocks wearing a white tee shirt outside in that area of St. Paul at 10:00 p.m. on a Friday night in late June, as over 15% of the City's population is African American[1], even more so in this neighborhood in St. Paul.

37.     Under the circumstances, the limited description by the anonymous caller fit too many individuals to constitute sufficient articulable facts to justify the stop of Baker, apart from the question of "reliability."

38.     Further, no witness had identified Baker or his vehicle as being involved in the alleged fight.

39.     Nor was Baker ever seen with a gun.

40.     Nontheless, Defendant B. Ficcadenti began yelling at Baker, commanding him to step out of his vehicle and to put his hands up.

41.     Baker followed Defendant B. Ficcadenti's commands and exited his vehicle with his arms up.

42.     Baker did not display any aggression.

43.     Nonetheless, less than twenty seconds after his first verbal command to Baker, without warning and seemingly ignoring Baker's peaceful compliance, Defendant B. Ficcadenti unleashed Falco on Baker.

---

[1] *See* U.S. Census Bureau, QuickFacts, St. Paul City, Minnesota, http://www.census.gov/quickfacts/table/ RHI225215/2758000#headnote-js-a (last visited February 15, 2016).

7

44.     Police Chief Axtell stated in a letter regarding the incident that Defendant B. Ficcaenti had "failed to utilize [his] squad car as trained in what [he] perceived to be a high-risk situation." "[B. Ficcadenti] did not position [his] vehicle so that [he] had cover, protection from bright lights or a barrier between himself and [Baker]. Rather, [B. Ficcadenti] chose to position [his] rear squad door closest to [Baker] so that [he] could deploy [his] K-9."

45.     Further, Chief Axtell noted Defendant B. Ficcadenti did not wait to deploy Falco until he had "multiple officers in a contact and cover configuration."

46.     Instead, as Chief Axtell also noted, contrary to training Defendant B. Ficcadenti released Falco on Baker and then "ran toward [Baker], who [he] believed was preparing to assault [him], with [his] firearm in [his] holster."

47.     At this point, additional St. Paul officers arrived at the scene and squad video from one of their squad vehicles began capturing the incident.

48.     After being released by Defendant B. Ficcadenti, Falco barreled down on Baker and attacked his right leg.

49.     On the video, Baker can be heard screaming as he is dragged to the ground by Falco.

50.     The dog attack continued and Falco dragged Baker around by his right leg.

51.     As the dog attack continued, four additional St. Paul police officers ran up to B. Ficcadenti, Falco and Baker – Defendants Palkowitsch, Norwicki, Spencer and Dick.

52.     Defendant Norwicki had brandished his AR-15 and had it aimed at Baker during the dog attack.

8

53.     The dog attack continued with the encouragement of Defendants B. Ficcadenti, Palkowitsch, Norwicki, Spencer and Dick, one or more of whom can be heard yelling such things as: "Get him. Get him." on the video.

54.     Defendant B. Ficcadenti also praised Falco, stating "good boy, good boy" repeatedly throughout the attack.

55.     While Falco was ravaging Baker's right leg and while Baker remained on the ground, Defendant Palkowitsch delivered three powerful kicks to Baker's ribs and midsection, all of which can also be seen on the video.

56.     Defendants Norwicki, Spencer and Dick stood by, failing to intervene to stop either Palkowitsch or Falco during the attack that lasted approximately 70 seconds.  These defendants observed patently excessive force and were in a position to stop it.  They chose not to.

57.     Instead of verbally disengaging Falco from Baker's leg, Defendant B. Ficcadenti can be seen choking Falco off from the bite – he grabbed Falco's collar to physical remove him from Baker's leg on at least one occasion.

58.     The stop of Baker was unconstitutional and racially motivated.

59.     There was no proper articulation of facts to support that Baker was the anonymously reported armed suspect.  No reasonable officer would have viewed Baker as a suspect in any crime and, in fact, he was not.

60.     Further, Defendants B. Ficcadenti, Palkowitsch, Norwicki, Spencer and Dick did not continue a search for the alleged gunman after Baker was attacked.

61.     Defendant B. Ficcadenti's release of Falco off leash, without warning, and the resulting seizure of Baker by Falco constitutes an unreasonable seizure and excessive force in violation of the Fourth Amendment of the United States Constitution.

62.     Baker was bit by Falco numerous times while he was dragged to the ground and around the parking lot.  He suffered road rash to his torso from being dragged so violently on the street surface.  Baker sustained severe and permanent injuries as a result of Defendant B. Ficcadenti's use of force.  The injuries were exacerbated due to Defendant B. Ficcadenti choking Falco off his bites – one signature of a poorly trained K-9.

63.     Defendant Palkowitsch's kicks to Baker's chest constitute excessive force in violation of the Fourth Amendment of the United States Constitution and caused further severe injuries to Baker, which would have independently required immediate emergency care to save Baker's life and prolonged hospitalization.

64.     Defendants Norwicki, Spencer and Dick, while acting under the color of state law, violated Baker's clearly established and well-settled civil rights by failing to intervene with the actions described above.

<u>**Baker's Injuries**</u>

65.     Baker was taken to Regions Hospital where he was admitted until discharged fourteen days later.

66.     Baker presented with numerous large wounds to his lower right leg, which were sustained during the K-9 attack.  There was significant tissue loss and damage, which left his tibia exposed.

67.     Baker's extensive injuries to his right leg are further evidence that Falco was choked off or lifted off the bite, which causes flesh and muscle to be torn off, as well as the vascular and neurological structures within the tissue.

68.     On June 25, 2016, Baker underwent his first irrigation and debridement procedure.  At this time, the total area of open wound on his right leg was more than 20 square centimeters.

69.     To avoid infection and to help facilitate functionality of Baker's leg, the wounds were debrided of devitalized, necrotic, loose and contaminated tissue and muscle, which left him with even larger gaping wounds.  His pretibial laceration – originally measuring 4 x 2 centimeters – was now 7 x 5 centimeters.

70.     The posterior aspect of Baker's lower right leg contained several lacerations, which were also debrided on June 25, 2016.  Subcutaneous tissues and devitalized muscle measuring a total of 10 x 5 centimeters was excised from this area.

71.     On June 27, 2016, an additional 150 centimeters of tissue was debrided from Baker's several wounds.

72.     At this time, wound VACs were placed in the three largest holes – Baker's two anterior wounds and one of the posterior wounds.  The wound VACs, pictured below, drained blood and fluid out of Baker's open wounds in further attempt to avoid infection.

 

73.    On June 30, 2016, an additional 65 square centimeters of muscle and skin was debrided from Baker's lower right leg.

74.    On July 5, 2016, an area of exposed anterior tibia remained in his right mid-calf, requiring a skin graft.

75.    The skin graft was taken from Baker's thigh and a bipedicled skin flap was designed from his medial calf.  The flap was secured to the lateral margin of Baker's exposed tibia.  The donor site, measuring 20 x 6 centimeters, was placed over the flap.

76.    Baker's other two large wounds measured 5 x 6 centimeters and 13 x 5 centimeters at this time and were also closed with skin grafts.

77.    Additionally, Baker sustained seven rib fractures and bilateral pneumothoraxes from the kicks by Defendant Palkowitsch.

78.    Baker required the placement of bilateral chest tubes, as depicted below.

12



79. During his hospitalization at Regions, Baker experienced difficulty breathing and pain with inspirations.

80. Baker was prescribed numerous narcotic medications to help with his pain from both the injuries to his chest and his right lower leg, including Dilaudid and Oxycodone.

81. Baker also required Zosyn (an antibiotic) intravenously.

82. Baker remains severely and permanently scarred on both his right lower leg as pictured below and on his chest where the chest tubes were placed.





83.    Baker has significant contouring defects in his lower right leg.

84.    Baker continues to experience issues with the dog bite wounds, the scars of which have periodically split open at the edge of his undamaged skin.  Further, Baker has lung and breathing problems from Defendant Palkowitsch's blows.

85.    However, Baker's injuries are not only physical in nature.  He began seeking treatment, upon a physician's referral, at HealthPartners Medical Group for his psychological issues stemming from the traumatic attack.

86.    On July 18, 2016, Baker initially presented with depression and anxiety.

87.    Baker's nightmares of the incident have interfered with his sleep.  He also has experienced intrusive thoughts regarding being beaten by police officers and a voice of an officer saying "kill him" and flashbacks of the K-9 attack.

88.    Since the incident, Baker has had difficulty sleeping, eating, breathing and does not want to be alone.  Further, he has lost interest in activities he enjoyed before the June 24, 2016 incident.

89.    Baker initially received a conservative diagnosis of adjustment disorder with anxiety and depression.

90.    He was prescribed mirtazapine to aid in sleep and increase his appetite.

91.    Baker continued treatment and a diagnosis of post-traumatic stress disorder ("PTSD") was confirmed on August 26, 2016.

92.    He has received continuing treatment for persistent PTSD since that date.

## Post-Incident Conduct of Defendants B. Ficcadenti, Palkowitsch, Norwicki, Spencer and Dick

93.     The video of the incident shows an attack on an innocent man.

94.     Defendants B. Ficcadenti, Palkowitsch, Norwicki, Spencer and Dick colluded with one another in the writing of their individual reports after assessing Baker's injuries.

95.     Defendants B. Ficcadenti, Palkowitsch, Norwicki, Spencer and Dick used their post-incident written reports to attempt to falsely justify the use-of-force on Baker.

96.     The reports are replete with racially pretextual, after-the-fact rationale and police buzz words.

97.     Defendant B. Ficcadenti noted that Baker matched a generic and fatally partial description of a man with a gun – a black male on foot with dreadlocks last seen wearing a white tee shirt.  It contained no height, weight, build, age or other descriptors.

98.     Defendants Palkowitsch and Spencer tout in their report the number of times St. Paul police have been called to the area where the incident occurred.

99.     Both Defendants Palkowitsch and Spencer provided detail regarding previous calls, including the types of calls SPPD officers have been called to the area for, for the purpose of painting a picture of a violent, hostile neighborhood where an "end justifies the means" type of law enforcement is necessary, albeit constitutionally improper.

100.     It is well known that the neighborhood contains a higher percentage of African-Americans and other people of color.

101.     However, Baker was not the person anonymously complained about.

102.     Baker was not on foot, but was in a car and had no gun.

16

103.     Baker was not involved in the weapon complaint to which the officers were originally called; nor was he at the building described in the call – he was several apartment buildings away.

104.     Defendant B. Ficcadenti claimed that while Baker was on the ground he "was still reaching around and turning from his back to his side several times."

105.     Defendant Dick claimed Baker "turned and began to sit up" and that he "would not stop moving around on the ground and he was yelling."

106.     Defendant Norwicki claimed that Baker "kept turning on his side and moving around" and that Baker kept "putting his hands near his waistband where suspects often conceal handguns and other weapons."

107.     Defendant Palkowitsch claimed "Baker would move his hands closer towards his body and out of the position he was ordered to leave them in." Further, he claimed "Baker was…rolling around and turning his body over so he was on his back instead of face down as he was ordered."

108.     These Defendants all failed to note Baker was being continually bitten and dragged around by Falco with the dog's jaws clinging to his legs and that Baker was screaming out in agony, actions which can be seen and heard clearly on the video evidence and which would explain his movements (whether volitional or an involuntary reaction to Falco's vicious attack).

109.     Widespread use of buzz words, racially-charged reporting, and false reporting contradicted by objective video evidence by all of these defendants in lockstep with each other evidences a custom and practice of constitutional misconduct.

110.    There are other incidents of such reporting among rank-and-file St. Paul Police officers.

111.    The supervisory defendants and policy makers at the City of St. Paul had actual knowledge of the constitutionally infirm force reporting in widespread use among officers or were deliberately indifferent to the need for proper reporting by turning a blind eye to the scene.

112.    The supervisory defendants were causally and directly involved in violation of Baker's constitutional rights.

113.    Rank-and-file officers felt free to flagrantly violate subjects' constitutional rights under department-wide reporting methods to cover it up.

114.    The video clearly shows Baker being dragged around by Falco during an attack that would inhibit anyone from complying with commands and would leave anyone writhing around in pain.

115.    These Defendants falsified reports, utilizing systematic buzz words and phrases (which given the video evidence are shown to be pretextual) in an attempt to conceal the unconstitutional stop of Baker, the unreasonable search and seizure, the excessive force by Defendants B. Ficcadenti and Palkowitsch and the other Defendants' failure to intervene.

116.    Baker was issued a citation for obstruction of legal process for the June 24, 2016 incident, but the Ramsey County prosecutor declined prosecution against Baker for any possible offense.

### St. Paul Police Department Action

117.    At the directive of the very recently installed SPPD Chief Todd D. Axtell, the

St. Paul Police Department ("SPPD") initiated an investigation into the June 24, 2016

incident.

118.    Upon information and belief, as a result of the incident, Defendant B.

Ficcadenti was provided notice of current SPPD Chief Todd D. Axtell's intent to terminate

his employment with the department.

119.    Defendant B. Ficcadenti met with Chief Axtell regarding the June 24, 2016

incident and the parties came to an agreement outlined in a November 3, 2016 Settlement

Letter.

120.    Within the letter, Chief Axtell notes Defendant B. Ficcadenti violated seven

departmental policies, including those that mirror the constitutional standards:

- **246.01 Response to Resistance and Aggression Continuum (Force is used "when and only to the extent reasonably necessary.")** The ability to disengage is imperative. Reasonably necessary – means that no reasonably effective alternative appears to exist and the amount of force used is reasonable to affect the lawful purpose intended.

- **230.12 City of St. Paul Civil Service Rules, 16.B**
    - **(4)**    Willful violation of the Civil Service Rules;
    - **(5)**    Conduct unbecoming a City employee;
    - **(11)**   Incompetent or inefficient performance of the duties of the employee's position.

- **150.02 Conduct Unbecoming a Police Officer** – An officer must, at all times, conduct him/herself in a manner which does not bring discredit to him/her, the department or the City…when an officer exceeds authority by unreasonable conduct, s/he thereby violates the sanctity of laws sworn to uphold.

- **150.04 Officer Response to Resistance and Aggression** – While the use of reasonable physical response to resistance and aggression may be necessary in situation which cannot be otherwise controlled, physical response to resistance and aggression may not be resorted to unless other reasonable alternatives have been exhausted or would clearly be ineffective under the particular circumstances.

- **150.09 Attention to Duty** – The responsibility for the proper performance of an officer's duty lies primarily with the officer. An officer carries a responsibility for the safety of the community and fellow officers. S/he discharges that responsibility by the faithful and diligent performance of assigned duty. Anything less violates trust placed by the people, and nothing less qualifies as professional conduct.

- **160.02  Individual Dignity** – Recognition of individual dignity is vital in a free system of law. Just as all persons are subject to the law, all persons have a right to dignified treatment under the law, and the protection of this right is a duty which is as binding to the department as any other.

- **170.01 Police Action Based on Legal Justification** – …an officer must act reasonably within the limits of authority as defined by statute…thereby ensuring that the rights of individuals and the public are protected.

121.   The following are the terms and conditions Defendant B. Ficcadenti agreed to in order to continue his employment with the City as a SPPD officer:

- You will be suspended for 30 days for the reasons identified in this settlement letter,

- You admit that there is a **factual basis** for this suspension,

- This suspension and other terms in this settlement will not be grieved,

- You will not return to the K-9 Unit, and

- You agree that failure to meet these expectations will result in your discharge from employment with the Saint Paul Police Department.

(emphasis added).

122.    Upon information and belief,  Palkowitsch is no longer employed with the City as an officer with the SPPD.

123.    Further, the SPPD Facebook page included a message from Chief Axtell, which provided the same sentiments that he expressed at a press conference – namely:  he was "disappointed and upset by what the video [of the Baker incident] shows" claiming that "the video does not reflect the way [SPPD] strive[s] to do [their] jobs – day in, day out.  This was not the Saint Paul way."

124.    Further, the Facebook message from current Chief Axtell claimed the SPPD has "increased training for officers…reaffirmed [its] expectations to the entire department…" and has taken steps to ensure the SPPD does not have a repeat incident like Baker's June 24, 2016 ghastly encounter with Defendants B. Ficcadenti, Palkowitsch, Norwicki, Spencer and Dick.

125.    But it is clear based on the statements of Defendant Ernster at the Press Conference called by the SPPD that there are those in the command structure that were still willing to publically, and thereby explicitly, put forth the pretexual and fabricated police excuses used by the reporting officers as the "facts" in this case according to Defendant Ernster.  None of the command personnel present disagreed with Defendant Ernster's recitation of the Defendant officers' reported facts.

126.    Defendant Ernster highlighted select information from the reports of the involved officers to publically put them in a positive light and to infer that they acted reasonably when, in fact, they did not.   These statements were made in front of the entire

command structure of the SPPD, the public and SPPD officers.  This is the supervisory conduct that begets that type of reporting and police conduct in the first place.

## COUNT I

### 42 U.S.C. § 1983 – FOURTH AMENDMENT VIOLATIONS
#### *Plaintiff v. Defendant B. Ficcadenti*

127.    Plaintiff realleges and incorporates by reference herein each and every allegation contained in each paragraph above as though fully set forth herein.

128.    By the actions described above, Defendant B. Ficcadenti, under the color of state law, violated and deprived Baker of his clearly established and well settled civil rights to be free from excessive force, unreasonable search and seizure, improper use of a K-9, improper reporting of use-of-force, and false arrest under the Fourth Amendment of the United States Constitution.

129.    Defendant B. Ficcadenti subjected Baker to these deprivations of his rights either maliciously or by acting with reckless disregard for whether his rights would be violated.

130.    As a direct and proximate result of the acts and omissions of Defendant B. Ficcadenti, Baker suffered injuries, was forced to endure great pain and mental suffering and was damaged in an amount exceeding $5,000,000.

131.    Punitive damages are available against Defendant B. Ficcadenti and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

132.   Baker is entitled to fully recover his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT II

### 42 U.S.C. § 1983 – FOURTH AMENDMENT VIOLATIONS
### *Plaintiff v. Defendant Palkowitsch*

133.   Plaintiff realleges and incorporates by reference herein each and every allegation contained in each paragraph above as though fully set forth herein.

134.   By the actions described above, Defendant Palkowitsch, under the color of state law, violated and deprived Baker of his clearly established and well settled civil rights to be free from excessive force, unreasonable search and seizure, improper reporting of use-of-force, and false arrest under the Fourth Amendment of the United States Constitution.

135.   Defendant Palkowitsch subjected Baker to these deprivations of his rights either maliciously or by acting with reckless disregard for whether his rights would be violated.

136.   As a direct and proximate result of the acts and omissions of Defendant Palkowitsch, Baker suffered injuries, was forced to endure great pain and mental suffering and was damaged in an amount exceeding $5,000,000.

137.   Punitive damages are available against Defendant Palkowitsch and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

138.   Baker is entitled to fully recover his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT III

### 42 U.S.C. § 1983 – FAILURE TO INTERVENE AND IMPROPER REPORTING OF USE-OF-FORCE
#### *Plaintiff v. Defendants Norwicki, Spencer and Dick*

139.    Baker realleges and incorporates by reference herein each and every allegation contained in each paragraph above as though fully set forth herein.

140.    Defendants Norwicki, Spencer and Dick had an affirmative duty to intervene to protect the constitutional rights of Baker from infringement by Defendants B. Ficcadenti and Palkowitsch.

141.    Defendants Norwicki, Spencer and Dick looked on as the constitutional violations committed by Defendants B. Ficcadenti and Palkowitsch were occurring and they had a reasonable opportunity to intervene.

142.    Defendants Norwicki, Spencer and Dick failed to intervene and are therefore liable for the same.

143.    Further, Defendants Norwicki, Spencer and Dick improperly reported the use-of-force incident regarding Baker.

144.    Defendants Norwicki, Spencer and Dick, under the color of state law, committed the above misconduct maliciously and with reckless disregard for whether Baker's rights would be violated.

145.    As a direct and proximate result of Defendants' failure to intervene, Baker suffered injuries, was forced to endure great pain and mental suffering and was damaged in an amount exceeding $5,000,000.

146.    Punitive damages are available against Defendants B. Ficcadenti and

Palkowitsch and are hereby claimed as a matter of federal common law under *Smith v. Wade*,

461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing

standard of proof set forth in Minn. Stat. § 549.20.

147.    Baker is entitled to fully recover his costs, including reasonable attorneys' fees,

under 42 U.S.C. § 1988.

### COUNT IV

**42 U.S.C. § 1981**
***Defendants B. Ficcadenti, Palkowitsch,***
***Norwicki, Spencer and Dick***

148.    Baker realleges and incorporates by reference herein each and every allegation

contained in each paragraph above as though fully set forth herein.

149.    Defendants B. Ficcadenti, Palkowitsch, Norwicki, Spencer and Dick denied

Baker full and equal protection of laws and proceedings for the security of his person and

property as enjoyed by white citizens when they subjected him to unreasonable search and

seizure, false arrest and excessive force and by failing to intervene with the same.

150.    The stop of Baker was pretextual and racially motivated, as were the events

that followed, which are shown in part, by the stop itself and the descriptions included in the

reports of Defendants B. Ficcadenti, Palkowitsch, Norwicki, Spencer and Dick.

151.    The roles of Defendant B. Ficcadenti and Palkowitsch in injuring Baker were

performed out of ill will or in a manner showing reckless disregard for Baker's rights.

152.   The failure to intervene by Defendants Norwicki, Spencer and Dick was likewise performed out of ill will or in a manner showing reckless disregard for Baker's rights.

153.   As a direct and proximate result of Defendants B. Ficcadenti, Palkowitsch, Norwicki, Spencer and Dick's deprivation of Baker's full and equal protection of laws, Baker suffered injuries,  Baker was forced to endure great pain and mental suffering and was damaged in an amount exceeding $5,000,000.

154.   Punitive damages are available against Defendants B. Ficcadenti, Palkowitsch, Norwicki, Spencer and Dick and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

155.   Baker is entitled to fully recover his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT V

### SUPERVISORY LIABILITY
### *Defendants Mike Ernster, Thomas E. Smith and John Does 1-2*

156.   Baker realleges and incorporates by reference herein each and every allegation contained in each paragraph above as though fully set forth herein.

157.   Defendants Ernster, Thomas E. Smith and John Does 1-2, at times material hereto, were members of the St. Paul Police Department with supervisory responsibility over Defendants B. Ficcadenti, Palkowitsch, Norwicki, Spencer and Dick.

158.   These supervisory defendants and policy makers at the City of St. Paul had actual knowledge of the constitutionally infirm force reporting in widespread use among

officers, specifically with regard to the use of buzz words, racially charged reporting, and false reporting, or were deliberately indifferent to the need for proper reporting by turning a blind eye at best of a public endorsement at worst.

159.    This is evidenced, among other things, by all of the officers' reporting conduct and by the comments supporting the pretextual and fabricated reporting at the Press Conference on November 4, 2016 by Defendant Ernster in front of the entire command structure of the SPPD.

160.    As such, rank and file, such as Defendants B. Ficcadenti, Palkowitsch, Norwicki, Spencer and Dick with regard to Baker, freely and flagrantly violate subjects' constitutional rights using department-wide reporting methods to cover it up.

161.    The supervisory Defendants had actual knowledge of the improper reporting by Defendants B. Ficcadenti, Palkowitsch, Norwicki, Spencer and Dick regarding the incident with Baker, further evidencing a policy or custom of constitutional misconduct.

162.    These supervisory Defendants, under color of state law, acted with deliberate indifference to, authorized or acquiesced in the violations of Baker's constitutional rights by Defendants B. Ficcadenti, Palkowitsch, Norwicki, Spencer and Dick.

163.    The supervisory Defendants committed the above misconduct either maliciously or with reckless disregard for whether Baker's rights would be violated.

164.    As a direct and proximate result of these supervisory Defendants' acts and omissions, Baker suffered Baker suffered injuries, was forced to endure great pain and mental suffering and was damaged in an amount exceeding $5,000,000.

165.     Punitive damages are available against Defendants B. Ficcadenti and

Palkowitsch and are hereby claimed as a matter of federal common law under *Smith v. Wade*,

461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing

standard of proof set forth in Minn. Stat. § 549.20.

166.     Baker is entitled to fully recover his costs, including reasonable attorneys' fees,

under 42 U.S.C. § 1988.

## COUNT VI

### CIVIL RIGHTS VIOLATION – FAILURE TO TRAIN
### UNDER CITY OF CANTON V. HARRIS
*Plaintiff v. Defendants Smith, M. Ficcadenti*
*and the City of St. Paul*

167.     Baker realleges and incorporates by reference herein each and every allegation

contained in each paragraph above as though fully set forth herein.

168.     Before June 24, 2016, the City of St. Paul intentionally, knowingly, recklessly

or with deliberate indifference to the rights of citizens, failed to properly train Defendant B.

Ficcadenti in the constitutionally proper methods of police K-9 use.

169.     Defendant M. Ficcadenti, as the head K-9 trainer, failed to properly train

SPPD officers or failed to require adherence to appropriate polices to avoid the improper

use of police K-9s when arresting citizens.

170.     Through Defendant and former SPPD Chief Thomas E. Smith's ratification

and approval of improper conduct, such as that implemented by Defendant M. Ficcadenti,

and by failing to discipline SPPD officers engaging in such improper conduct, there has been

an approval of a deficient policy, custom, or practice of the improper use police K-9s

without sanction or consequence.

171.    As a direct and proximate result the acts and omissions by the City of St. Paul and Defendant Smith, Baker suffered injuries, was forced to endure great pain and mental suffering and was damaged in an amount exceeding $5,000,000.

172.    Baker is entitled to fully recover his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

**COUNT VII**

**CIVIL RIGHTS VIOLATIONS**
**MONELL V. DEP'T OF SOCIAL SERVICES**
***Plaintiff v. Defendant City of St. Paul***

173.    Baker realleges and incorporates by reference herein each and every allegation contained in each paragraph above as if fully set forth herein.

174.    Before June 24, 2016, the City of St. Paul with deliberate indifference to the rights of citizens, initiated, tolerated, permitted, failed to correct, promoted, and/or ratified a custom, pattern or practice on the part of its officers, including the Defendants herein, of the improper use of K-9s when arresting citizens.

175.    Before June 24, 2016, the City of St. Paul with deliberate indifference to the rights of citizens, initiated, tolerated, permitted, failed to correct, promoted, and/or ratified a custom, pattern or practice on the part of its officers, including the Defendants herein, of the improper reporting of use-of-force.

176.    Through Chief Smith and the department's ratification and approval, and by failing to discipline all officers consistently on this point, there has been an approval of a deficient policy, custom or practice of both the improper use of K-9s and the improper reporting of the use-of-force.

177.    Baker's injuries were directly and proximately caused by the aforementioned acts and omissions and by the City's customs, patterns, and/or practices, and the City of St. Paul is thereby liable in an amount exceeding $5,000,000.

178.    Baker is entitled to fully recover his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

### Prayer for Relief

WHEREFORE, Plaintiff Frank A. Baker prays for judgment against Defendants as follows:

1.    That this Court find that the Defendants committed acts and omissions constituting violations of the Fourth Amendment to the United States Constitution, actionable under 42 U.S.C. § 1983, as well as acts constituting violations of 42 U.S.C. § 1981;

2.    As to Count I, a money judgment against Defendant Brian Ficcadenti for compensatory damages and punitive damages in an amount in excess of $5,000,000.00, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

3.    As to Count II, a money judgment against Defendant Brett Palkowitsch for compensatory damages and punitive damages in an amount in excess of $5,000,000.00, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

4.    As to Count III, a money judgment against Defendants Brian Norwicki, Anthony T. Spencer and Joseph M. Dick, for compensatory damages and punitive damages

in an amount in excess of $5,000,000.00, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

5.      As to Count IV, a money judgment against Defendants Brian Ficcadenti, Brett Palkowitsch, Brian Norwicki, Anthony T. Spencer and Joseph M. Dick, for compensatory damages and punitive damages in an amount in excess of $5,000,000.00, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

6.      As to Count V, a money judgment against Defendants Mike Ernster, Thomas E. Smith and John Does 1-2, for compensatory damages and punitive damages in an amount in excess of $5,000,000.00, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

7.      As to Count VI, a money judgment against Defendants Mark Ficcadenti, Thomas E. Smith and the City of St. Paul, for compensatory damages in an amount in excess of $5,000,000.00, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

8.      As to Count VII, a money judgment against the City of St. Paul for compensatory damages in an amount in excess of $5,000,000.00, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

9.      For an order mandating changes in the policies and procedures of the St. Paul Police Department requiring, among other things, policy and training measures in the proper use of K-9s to apprehend suspects, the proper reporting of use-of-force, and race relations and policing; and

10.     For such other and further relief as this Court may deem just and equitable.

GASKINS BENNETT BIRRELL SCHUPP L.L.P.


Date:  February 17, 2017          s/Robert Bennett
                                  Robert Bennett, #6713
                                  Andrew J. Noel, #322118
                                  Kathryn H. Bennett, #0392087
                                  333 South Seventh Street, #3000
                                  Minneapolis, MN 55402
                                  Telephone: 612-333-9500
                                  rbennett@gaskinsbennett.com
                                  anoel@gaskinsbennett.com
                                  kbennett@gaskinsbennett.com